# Exhibit 8

The Honorable James L. Robart

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

9   ATIGEO LLC, a Washington limited                )
    liability company; and MICHAEL              )   NO. 2:13-cv-01694
10  SANDOVAL, an individual,                     )
                                                 )   **DEFENDANT ISTVAN BURGYAN'S**
11              Plaintiffs,                       )   **FIRST SUPPLEMENTAL RESPONSES**
                                                 )   **TO PLAINTIFF ATIGEO LLC'S FIRST**
12  vs.                                          )   **SET OF INTERROGATORIES AND**
                                                 )   **REQUESTS FOR PRODUCTION**
13  OFFSHORE LIMITED D, a California             )
14  business organization, form unknown;         )
    OFFSHORE LMITED D, a California              )
15  partnership; DENNIS MONTGOMERY,              )
    individually and as a partner of Offshore    )
16  Limited D; ISTVAN BURGYAN,                   )
    individually and as a partner of Offshore    )
17  Limited D; DEMARATECH, LLC, a                )
    California limited liability company; and     )
18  DOES 1-10, inclusive,                        )
                                                 )
19              Defendant.                        )
                                                 )
20

21          Istvan Burgyan (hereinafter "Burgyan" or "defendant"), by and through his counsel of

22  record, hereby supplements his responses to Atigeo's First Interrogatories and Request for

23  Production.  Mr. Burgyan incorporates by reference his prior general objections as asserted in

24  his initial answers and responses.

25          **RFP NO. 15:**  Please produce all DOCUMENTS REGARDING the formation of

DEFENDANT ISTVAN BURGYAN'S FIRST
SUPPLEMENTAL RESPONSES TO PLAINTIFF
ATIGEO LLC'S FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION -1-

McGAUGHEY BRIDGES DUNLAP PLLC
325 – 118TH AVENUE SOUTHEAST, SUITE 209
BELLEVUE, WASHINGTON 98005 – 3539
(425) 462 – 4000
(425) 637 – 9638 FACSIMILE

1    Demaratech, LLC

2        **RESPONSE:   Demaratech LLC has not conducted any business since 2010.   It is**

3    **believed the only remaining documents from this business pertain to corporate formation**

4    **(i.e. articles of incorporation).   However, defendant does not currently have these**

5    **documents in his possession as they are believed to be kept in a storage facility in**

6    **California.  Defendant will supplement this Request as documents become available.**

7        **SUPPLEMENTAL RESPONSE:   Please see the following attachments: (1)**

8    **Operating Agreement for Demaratech LLC, dated July 24, 2009; and (2) California**

9    **Limited Liability Company Articles of Organization for Demaratech LLC, dated March**

10   **17, 2009.**

11

12       **RFP NO. 16:**   Please produce all DOCUMENTS REGARDING the ownership of

     Demaratech, LLC.

13       **RESPONSE:   Demaratech LLC has not conducted any business since 2010.   It is**

14   **believed the only remaining documents from this business pertain to corporate formation**

15   **(i.e. articles of incorporation).   However, defendant does not currently have these**

16   **documents in his possession as they are believed to be kept in a storage facility in**

17   **California.  Defendant will supplement this Request as documents become available.**

18       **SUPPLEMENTAL RESPONSE:   Please see defendant's response to Request**

19   **number 15 which attaches the following documents: (1) Operating Agreement for**

20   **Demaratech LLC, dated July 24, 2009; and (2) California Limited Liability Company**

21   **Articles of Organization for Demaratech LLC, dated March 17, 2009.**

22

23       **RFP NO. 19:**   Please produce all DOCUMENTS reflecting the directors or officers of

24   Demaratech, LLC.

25       **RESPONSE:   Demaratech LLC has not conducted any business since 2010.   It is**

     **believed the only remaining documents from this business pertain to corporate formation**

DEFENDANT ISTVAN BURGYAN'S FIRST
SUPPLEMENTAL RESPONSES TO PLAINTIFF
ATIGEO LLC'S FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION -2-



McGAUGHEY BRIDGES DUNLAP PLLC
325–118TH AVENUE SOUTHEAST, SUITE 209
BELLEVUE, WASHINGTON 98005–3539
(425) 462–4000
(425) 637–9638 FACSIMILE

(i.e. articles of incorporation).   However, defendant does not currently have these documents in his possession as they are believed to be kept in a storage facility in California.  Defendant will supplement this Request as documents become available.

SUPPLEMENTAL RESPONSE:   Please see defendant's response to Request number 15 which attaches the following documents: (1) Operating Agreement for Demaratech LLC, dated July 24, 2009; and (2) California Limited Liability Company Articles of Organization for Demaratech LLC, dated March 17, 2009.

RFP NO. 20:  Please produce all operating agreements REGARDING Demaratech, LLC.

RESPONSE: Demaratech LLC has not conducted any business since 2010.  It is believed the only remaining documents from this business pertain to corporate formation (i.e. articles of incorporation).   However, defendant does not currently have these documents in his possession as they are believed to be kept in a storage facility in California.  Defendant will supplement this Request as documents become available.

SUPPLEMENTAL RESPONSE:   Please see defendant's response to Request number 15 which attaches the Operating Agreement for Demaratech LLC.

RFP NO. 21:   Please produce all DOCUMENTS reflecting the members of Demaratech, LLC.

RESPONSE:  Demaratech LLC has not conducted any business since 2010.  It is believed the only remaining documents from this business pertain to corporate formation (i.e. articles of incorporation).   However, defendant does not currently have these documents in his possession as they are believed to be kept in a storage facility in California.  Defendant will supplement this Request as documents become available.

SUPPLEMENTAL RESPONSE:   Please see defendant's response to Request number 15 which attaches the following documents: (1) Operating Agreement for

DEFENDANT ISTVAN BURGYAN'S FIRST
SUPPLEMENTAL RESPONSES TO PLAINTIFF
ATIGEO LLC'S FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION -3-



McGAUGHEY BRIDGES DUNLAP PLLC
325 – 118TH AVENUE SOUTHEAST, SUITE 209
BELLEVUE, WASHINGTON 98005 – 3539
(425) 462 – 4000
(425) 637 – 9638 FACSIMILE

Tellis Dec. Ex. 8, Page 3 of 50

1    Demaratech LLC, dated July 24, 2009; and (2) California Limited Liability Company

2    Articles of Organization for Demaratech LLC, dated March 17, 2009.

3

4       **RFP NO. 22:**  Please produce all DOCUMENTS reflecting Demaratech, LLC's place

5    of business.

6       **RESPONSE:**  Demaratech LLC has not conducted any business since 2010.  It is

7    believed the only remaining documents from this business pertain to corporate formation

8    (i.e. articles of incorporation).   However, defendant does not currently have these

9    documents in his possession as they are believed to be kept in a storage facility in

10   California.  Defendant will supplement this Request as documents become available.

11      **SUPPLEMENTAL RESPONSE:** Please see defendant's response to Request

12   number 15 which attaches the following documents: (1) Operating Agreement for

13   Demaratech LLC, dated July 24, 2009; and (2) California Limited Liability Company

14   Articles of Organization for Demaratech LLC, dated March 17, 2009.

15      DATED this 12th day of March, 2014.

16                          McGAUGHEY BRIDGES DUNLAP, PLLC

17

18                          _/s/ Peter Nierman_____
                            Shellie McGaughey, WSBA #16809
19                          Peter Nierman, WSBA #44636
                            Attorneys for Defendants
20

21

22

23

24

25

DEFENDANT ISTVAN BURGYAN'S FIRST
SUPPLEMENTAL RESPONSES TO PLAINTIFF
ATIGEO LLC'S FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION -4-



McGAUGHEY BRIDGES DUNLAP PLLC
325—118TH AVENUE SOUTHEAST, SUITE 209
BELLEVUE, WASHINGTON 98005—3539
(425) 462—4000
(425) 637—9638 FACSIMILE

**VERIFICATION**

STATE OF WASHINGTON )
                    ) ss.
COUNTY OF KING      )

Istvan Burgyan, being first duly sworn, on oath deposes and says:

That I am an individual Defendant in the above cause of action; that I have read the foregoing Interrogatories and Requests for Production of Documents and the answers and responses thereto and have reviewed the documents produced, know the contents thereof, and believe the answers to the Interrogatories and responses to the Requests to be true and the documents produced complete.

_____
Signature

_____
Print Name

SUBSCRIBED AND SWORN TO before me this _____ day of _____, 2014.

Signature:_____

Name (Print):_____
NOTARY PUBLIC in and for the State of
Washington, residing at_____
My appointment expires:_____

**STATEMENT OF ATTORNEY**

The undersigned hereby states that he is the attorney for the party answering the above propounded Interrogatories and responding to the Interrogatories and Requests for Production of Documents, and that all objections, if any, set forth in response to said Interrogatories and Requests were made by the undersigned as required by CR 26(g).

DATED this 12th day of March, 2014.

/s/ Peter Nierman
Name:  Peter Nierman

DEFENDANT ISTVAN BURGYAN'S FIRST
SUPPLEMENTAL RESPONSES TO PLAINTIFF
ATIGEO LLC'S FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION -5-

McGAUGHEY BRIDGES DUNLAP PLLC
325–118TH AVENUE SOUTHEAST, SUITE 209
BELLEVUE, WASHINGTON 98005–3539
(425) 462–4000
(425) 637–9638 FACSIMILE

Tellis Dec. Ex. 8, Page 5 of 50

# CERTIFICATE OF SERVICE

I certify that on March 12, 2014, I caused the foregoing to be served on the following by the methods indicated:

| | |
|---|---|
| Roland Tellis | ___ Via hand delivery by Legal Messenger |
| Peter Smith | ___ Via U.S. Mail, 1st Class, Postage Prepaid |
| BARON & BUDD, P.C. | ___ Via Overnight Delivery |
| 15910 Ventura Boulevard, Suite 1600 | ___ Via Facsimile |
| Encino, California, 91436 | _X_ Via Email |
| | ___ Other: Electronic Pacer |
| Brian C. Park | _X_ Via hand delivery by Legal Messenger |
| STOEL RIVES LLP | ___ Via U.S. Mail, 1st Class, Postage Prepaid |
| 600 University Street, Suite 3600 | ___ Via Overnight Delivery |
| Seattle, WA 98101 | ___ Via Facsimile |
| | _X_ Via Email |
| | ___ Other: Electronic Pacer |
| Paul Brain | _X_ Via hand delivery by Legal Messenger |
| Brain Law Firm PLLC | ___ Via U.S. Mail, 1st Class, Postage Prepaid |
| 1119 Pacific Avenue, Suite 1200 | ___ Via Overnight Delivery |
| Tacoma, WA 98402 | ___ Via Facsimile |
| | _X_ Via Email |
| | ___ Other: Electronic Pacer |

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 12th day of March, 2014.

_/s/ Katie Berry_
Katie Berry

**DEFENDANT ISTVAN BURGYAN'S FIRST
SUPPLEMENTAL RESPONSES TO PLAINTIFF
ATIGEO LLC'S FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION -6-**



McGAUGHEY BRIDGES DUNLAP PLLC
325 – 118TH AVENUE SOUTHEAST, SUITE 209
BELLEVUE, WASHINGTON 98005 – 3539
(425) 462 – 4000
(425) 637 – 9638 FACSIMILE

# RFP NO. 15

# OPERATING AGREEMENT
## FOR
# DEMARATECH, LLC
### A CALIFORNIA LIMITED LIABILITY COMPANY

This Operating Agreement is made as of July 24, 2009, by and among the parties listed on the signature pages hereof, with reference to the following facts:

A.     On March 17, 2009, Articles of Organization for DEMARATECH, LLC (the "Company"), a limited liability company formed under the laws of the State of California, were filed with the California Secretary of State.

B.     The parties desire to adopt and approve an operating agreement for the Company.

NOW, THEREFORE, the parties (hereinafter sometimes collectively referred to as the Members," or individually as each or the "Member") by this Agreement set forth the operating agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

## ARTICLE I
## DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

1.1     "Act" shall mean the Beverly-Killea Limited Liability Company Act, codified in the California Corporations Code, Section 17000 et seq., as the same may be amended from time to time.

1.2     "Affiliate" shall mean any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member. The term "control," as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company, and with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.3     "Agreement" shall mean this Operating Agreement, as originally executed and as amended from time to time.

1.4     "Articles" shall mean the Articles of Organization for the Company originally filed with the California Secretary of State and as amended from time to time.

1.5     "Bankruptcy" shall mean: (a) the filing of an application by a Member for, or his or her consent to, the appointment of a trustee, receiver, or custodian of his or her other assets;

1

Tellis Dec. Ex. 8, Page 8 of 50

(b) the entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) the failure by a Member generally to pay his or her debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his or her inability to pay his or her debts as they become due.

1.6   "Capital Account"  shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.3.

1.7   "Capital Contribution"  shall mean the total value of cash and fair market value of property (including promissory notes or other obligation to contribute cash or property) contributed and/or services rendered or to be rendered to the Company by Members.

1.8   "Code"  shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

1.9   "Company"  shall mean DEMARATECH, LLC, a California limited liability company.

1.10   "Company Minimum Gain"  shall have the meaning ascribed to the term "Partnership Minimum Gain" in the Regulations Section 1.704-2 (d).

1.11   "Corporations Code"  shall mean the California Corporations Code, as amended from time to time, and the provisions of succeeding law.

1.12   "Dissolution Event"  shall mean with respect to any Member one or more of the following: the death, insanity, withdrawal, Bankruptcy or occurrence of any other event which terminates the continued membership of any Member unless the other Members consent to continue the business of the Company pursuant to Section 8.1.

1.13   "Distributable Cash"  shall mean the amount of cash which the Manager deems available for distribution to the Members, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Manager deems necessary to place into reserves for customary and usual claims with respect to the Company's business.

1.14   "Economic Interest"  shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management, or except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of Company.

2

07/27/09

**Tellis Dec. Ex. 8, Page 9 of 50**

1.15   "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.16   "Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

1.17   "Former Member" shall have the meaning ascribed to it in Section 8.1.

1.18   "Former Member's Interest" shall have the meaning ascribed to it in Section 8.1.

1.19   "Majority Interest" shall mean one or more Percentage Interests of Members which taken together exceed fifty percent (50%) of the aggregate of all Percentage Interests.

1.20   "Manager" shall mean one or more managers. Specifically, "Manager" shall mean L.R. Wilkerson, or any other person or persons who succeed him in that capacity.

1.21   "Member" shall mean each Person who (a) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with the Articles of this Agreement or is an assignee who has become a Member in accordance with Article VII, and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved.

1.22   "Member Nonrecourse Debt" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2 (b) (4).

1.23   "Member Nonrecourse Deductions" shall mean items of Company loss, deduction, or Code Section 705(a) (2) (B) expenditures which are attributable to Member Nonrecourse Debt.

1.24   "Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management, and the right to receive information concerning the business and affairs, of the Company.

1.25   "Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the method of accounting at the close of each fiscal year on the Company's information tax return filed for federal income tax purposes.

1.26   "Nonrecourse Liability" shall have the meaning set forth in Regulations Section 1.752-1 (a) (2).

1.27   "Percentage Interest" shall mean the percentage of a Member set forth opposite the name of such Member under the column "Member's Percentage Interest" in Exhibit "A" attached hereto, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement or by law.

3

**Tellis Dec. Ex. 8, Page 10 of 50**

**1.28** "Person" shall mean an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust, association or any other entity.

**1.29** "Regulations" shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

**1.30** "Remaining Members" shall have the meaning ascribed to it in Section 8.1.

**1.31** "Super Majority" shall mean one or more Percentage Interest of Members which taken together exceed seventy percent (70%) of the aggregate of all Percentage Interests;

**1.32** "Tax Matters Partner" shall be the Manager or his successor as designated pursuant to Section 9.8.

## ARTICLE II
## ORGANIZATIONAL MATTERS

**2.1** Formation. Pursuant to the Act, the Members have formed a California limited liability company under the laws of the State of California by filing the Articles with the California Secretary of State and entering into this Agreement. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

**2.2** Name. The name of the Company shall be "DEMARATECH, LLC". The business of the Company may be conducted under that name, or under that name, or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable. The Manager shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Manager considers appropriate or advisable.

**2.3** Term. The term of this Agreement shall be co-terminus with the period of duration of the Company as hereinafter provided.

**2.4** Office and Agent. The Company shall continuously maintain an office and registered agent in the State of California as required by the Act. The principal office of the Company shall be as the Manager may determine. The Company also may have such offices, anywhere within and without the State of California, as the Manager from time to time may determine, or the business of the Company may require. The registered agent shall be as stated in the Articles or as otherwise determined by the Manager.

**2.5** Addresses of the Members and the Manager. The respective addressees of the Members and the Manager are set forth on **Exhibit A.**

4

Collab/Burgyan/Demaratech/Operating Agreement

07/27/09

    **2.6**    <u>Purpose of Company</u>.  The purpose of the Company is to engage in the following activities:

        (a)    Engage in the development, sale, servicing, repair, management and operation of software.

        (b)    Making investments, and engaging  in any joint venture, general partnership, limited partnership, limited liability company or other business in furtherance of the above referenced activities and such other activities as are reasonably necessary to carry out the forgoing purposes.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

    **3.1**    <u>Initial Capital Contributions</u>.  Each Member shall contribute such amount(s) as is set forth on Exhibit "A" as his or her initial contribution Capital Contribution which Exhibit "A" shall be revised to reflect any additional contribution contributed in accordance with Section 3.2.

    **3.2**    <u>Additional Capital Contributions</u>.  No Member shall be required to make any Capital Contributions other than the Capital Contributions described in Section 3.1 above.  However, to the extent additional capital calls are from time to time unanimously approved by the Members, the Members shall make additional Capital Contributions on a pro rata basis in accordance with their respective Percentage Interests. To the extent approved by Members who hold a Super Majority, from time to time, the Members may be permitted to make additional Capital Contributions if and to the extent they so desire and if the Manager determines that such additional Capital Contribution are necessary or appropriate for the conduct Company's business, including without limitation, expansion or diversification of such business.  In that event each Member shall have the opportunity, but not the obligation, to participate in such additional Capital Contributions on a prorata basis in accordance with their Percentage Interest. Immediately following such Capital Contributions, the Percentage Interest shall be adjusted by the Manager to reflect the new relative proportions of the Capital Accounts of the Members.

    **3.3**    <u>Capital Accounts</u>.  The Company shall establish an individual Capital Account for each Member.  The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv).  If a Member transfers all or a part of his or her Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

    **3.4**    <u>No Interest</u>.  No Member shall be entitled to receive any interest (Preferred Return is not interest) on his, her or its Capital Contributions.

    **3.5**    <u>Loans by Members</u>. In the event at any time during the term hereof (a) the cash funds of the Company on hand at such time are not sufficient for payment of all outstanding and unpaid current obligations of the Company as of such time, (b) the Capital Contributions required pursuant to Section 3.1 above are insufficient to meet the current obligations of the

5

**Tellis Dec. Ex. 8, Page 12 of 50**

Company, and (c) the Manager determines that such additional funds are necessary for the conduct of the Company's business, then a Member may advance to the Company all or any portion of such funds as may be necessary to cover such deficit; provided, however, no Member shall have any obligation to the Company or the Members to advance any such funds to the Company. Any funds advanced to the Company pursuant to this Section 3.5 shall be a loan by the Member to the Company and shall bear interest from the date of advance until payment at the rate of ten percent (10%) per annum. The debt obligation of the Company to the Member shall be evidenced by a Promissory Note in substantially the same form attached hereto as Exhibit "B" attached hereto. The unpaid principal and interest on any loans made pursuant to Section 3.5 shall be repaid prior to making other distributions of Distributable Cash as provided in Section 6.5 below.

**ARTICLE IV**
**MEMBERS**

**4.1**   <u>Limited Liability</u>.  Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

**4.2**   <u>Admission of Additional Members</u>.  The Manager, with the approval of a Majority in Interest, may admit to the Company additional Members.  Any additional Members shall obtain Membership Interests and will participate in the management, Net Profits, Net Losses, and distributions of the Company on such terms as are determined by the Manager and approved by the Members.  Notwithstanding the foregoing, substitute Members may only be admitted in accordance with Article VII.

**4.3**   <u>Withdrawals</u>.  No Member may withdraw or resign from the Company except upon the consent of a Super Majority.  If a Member withdraws pursuant to this Section 4.3, the Member's interest in the Company shall be purchased by the Company and/or the remaining Members in accordance with the provisions of Section 4.4 and Article VIII.

**4.4**   <u>Termination of Membership Interest</u>.   Upon the transfer of a Member's Membership Interest in violation of this Agreement, the occurrence of a Dissolution Event as to such Member which does not result in the dissolution of the Company or the withdrawal of a Member in accordance with Section 4.3, the Membership Interest of a Member shall be terminated by the Manager or such Membership Interest shall be purchased by the Company or remaining Members as provided herein.  Each Member acknowledges and agrees that such termination or purchase of a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

**4.5**   <u>Transactions With The Company</u>.  Subject to any limitations set forth in this Agreement and with the prior approval of the Manager after full disclosure of the Member's involvement, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

6

**Tellis Dec. Ex. 8, Page 13 of 50**

**4.6**   <u>Remuneration To Members</u>.   Except as otherwise authorized in, or pursuant to this Agreement, no Member is entitled to remuneration for acting in the Company business, subject to the entitlement of the Manager or Members winding up the affairs of the Company to reasonable compensation pursuant to Section 10.3.

**4.7**   <u>Members Are Not Agents</u>.   Pursuant to Section 5.1 and the Articles, the management of the Company is vested in the Manager. No Member, acting solely in the capacity of a Member, is an agent or the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

**4.8**   <u>Voting Rights</u>.   Except as expressly provided in this Agreement or the Articles, Members shall have no voting, approval or consent rights.  Members shall have the right to approve or disapprove matters as specifically stated in this Agreement, including the following:

**A.**   <u>Majority Approval</u>.   Except as otherwise provided by the California Corporations Code, the following matters shall require approval of a Majority in Interest of Members who are not the subject of a Dissolution Event or an assignor of a Membership Interest:

(i)   A decision to continue the business of the Company after the occurrence of a Dissolution Event.

(ii)   Except as provided in Section 7.4, the transfer of a Membership Interest and admission of the assignee as a Member of the Company.

(iii)   Any amendment of the Articles or this Agreement.

(iv)   A decision to compromise the obligation of a Member to make a Capital Contribution or return money or property paid or distributed in violation of the Act.

**B.**   <u>Approval by Members Holding a Majority Interest</u>. Except as expressly set forth in this Agreement to the contrary or as otherwise provided by law, in all matter in which a vote, approval or consent of the Members is required, a vote, consent or approval of Members holding a Majority Interest (or, in instances in which there are defaulting members, non-defaulting Members who hold a majority of the Percentage Interests held by all non-defaulting Members) shall be sufficient to authorize or approve such act.

**C.**   <u>Other Voting Rights</u> .   Besides the rights granted in Section 4.8A., Members may vote, consent or approve to the extent and on the terms provided in this Agreement in the following Sections and action on said matters may be taken upon approval of a Majority Interest (unless approval by a Super Majority or unanimous consent is required by the particular Section):

(i)   Section 3.2 on additional Capital Contributions;

7

07/27/09

**Tellis Dec. Ex. 8, Page 14 of 50**

 (ii)  Section 3.5 on remedies for a Member's failure to make a contribution;

 (iii)  Section 4.2 on admission of new Members:

 (iv)  Section 5.2 on election and removal of the Manager;

 (v)  Section 5.3B on a change in the purpose of the Company;

 (vi)  Section 5.3B on reorganization of the Company;

 (vii)  Section 5.3B on other limitations on the Manager's authority;

 (viii)  Section 5.8 on transactions with the Manager and Affiliates of the Manager;

 (ix)  Section 5.9A on management fees payable to the Manager; and

 (x)  Section 10.1 on dissolving the Company.

**4.9** <u>Meetings of Members</u>

 A. <u>Date, Time and Place of Meetings of Members; Secretary</u>.  Meetings of Members may be held at such date, time and place within or without the State of California as the Manager may fix from time to time.  No annual or regular meeting of Members is required.  At any Members' meeting, the Manager shall appoint a person to preside at the meeting and a person to act as secretary of the meeting.  The secretary of the meeting shall prepare minutes of the meeting which shall be placed in the minute books of the Company.

 B. <u>Power to Call Meetings</u>.  Unless otherwise prescribed by the Act or by the Articles, meetings of the Members may be called by the Manager, or upon written demand of Members holding at least ten percent (10%) of the Percentage Interests for the purpose of addressing any matters on which the Members may vote.

 C. <u>Notice of Meeting</u>.  Written notice of a meeting of Members shall be sent or otherwise given to each Member in accordance with Section 4.9D not less than ten (10) nor more than sixty (60) days before the date of the meeting.  The notice shall specify the place, date and hour of the meeting and the general nature of the business to be transacted.  No other business may be transacted at this meeting.  Upon written request to the Manager by any person entitled to call a meeting of Members, the Manager shall immediately cause notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the person calling the meeting, not less than ten (10) days nor more than sixty (60) days after the receipt of the request.  If the notice is not given within twenty (20) days after the receipt of the request, the person entitled to call the meeting may give the notice.

8

Tellis Dec. Ex. 8, Page 15 of 50

D.    Manner of Giving Notice: Affidavit of Notice.  Notice of any meeting of Members shall be given either personally or by first-class mail or telegraphic or other written communication, charges prepaid, addressed to the Member at the address of that Member appearing on the books of the Company or given by the Member to the Company for the purpose of notice.  If no such address appears on the Company's books or is given, notice shall be deemed to have been given if sent to that Member by first-class mail or telegraphic or other written communication to the Company's principal executive office, or if published at least once in a newspaper of general circulation in the county where that office is located.  Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by telegram or other means of written communication.

If any notice addressed to a Member at the address of that Member appearing on the books of the Company is returned to the Company by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the Member at that address, all future notices or reports shall be deemed to have been duly given without further mailing if these shall be available to the Member on written demand of the Member at the principal executive office of the Company for a period of one year from the date of the giving of the notice.

An affidavit of the mailing or other means of giving any notice of any meeting shall be executed by the Manager or any secretary, assistant secretary, or any transfer agent of the Company giving the notice, and shall be filed and maintained in the minute book of the Company.

E.    Validity of Action.  Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the notice of meeting or in any written waiver of notice.

F.    Quorum.  The presence in person or by proxy of the holders of a Majority Interest shall constitute a quorum at a meeting of Members.  The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum (other than adjournment) is approved by at least Members holding a Majority Interest.

G.    Adjourned Meeting: Notice.  Any Members' meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the Membership Interests represented at that meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at that meeting, except as provided in Section 4.9F.  When any meeting of Members is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place are announced at a meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is subsequently fixed, or unless the adjournment is for more than forty-five (45) days from the date set for the original meeting, in which case the Manager shall set a new record date.  At any adjourned meeting the Company may transact any business which might have been transacted at the original meeting.

9

H.    Waiver of Notice or Consent.   The actions taken at any meeting of Members however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, who was not present in person or by proxy, signs a written waiver of notice or consents to the holding of the meeting or approves the minutes of the meeting.  All such waivers, consents or approvals shall be filed with the Company records or made a part of the minutes of the meeting.

Attendance of a person at a meeting shall constitute a waiver of notice of that meeting, except when the person objects at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened, and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the meeting.  Neither the business to be transacted nor the purpose of any meeting of Members need be specified in any written waiver of notice except as provided in Section 4.9E.

I.    Action by Written Consent Without a Meeting .  Any action that may be taken at a meeting of Members may be taken without a meeting, if a consent in writing setting forth the action so taken, is signed and delivered to the Company within sixty (60) days of the record date for that action by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote on that action at a meeting were present and voted.  All such consents shall be filed with the Manager or the secretary, if any, of the Company and shall be maintained in the Company records.  Any Member giving a written consent, or the Member's proxy holders, may revoke the consent by a writing received by the Manager or secretary, if any, of the Company before written consents of the number of votes required to authorize the proposed action have been filed.

Unless the consents of all Members entitled to vote have been solicited in writing, (i) notice of any Member approval of an amendment to the Articles or this Agreement, a dissolution of the Company, or a merger of the Company, without a meeting by less than unanimous written consent, shall be given at least ten (10) days before the consummation of the action authorized by such approval, and (ii) prompt notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

J.    Telephonic Participation by Member at Meetings.  Members may participate in any Members' meeting through the use of any means of conference telephones similar communications equipment as long as all Members participating can hear one another.  A Member so participating is deemed to be present in person at the meeting.

K.    Record Date.  In order that the Company may determine the Members of record entitled to notices of any meeting or to vote, or entitled to receive any distribution or to exercise any rights in respect of any distribution or to exercise any rights in respect of any other lawful action, the Manager, or Members representing more than ten percent (10%) of the Percentage Interests may fix, in advance, a record date, that is not more than sixty (60) days nor

10

07/27/09

Tellis Dec. Ex. 8, Page 17 of 50

less than ten (10) days prior to the date of the meeting and not more than sixty (60) days prior to any other action. If no record date is fixed:

(i)    The record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(ii)   The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

(iii)  The record date for determining Members for any other purpose shall be at the close of business on the day on which the Manager adopt the resolution relating thereto, or the 60th day prior to the date of the other action, whichever is later.

(iv)   The determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless the Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than 45 days from the date set for the original meeting.

L.    Proxies. Every Member entitled to vote for The Manager or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the person and filed with the Manager or Secretary, if any, of the Company. A proxy shall be deemed signed if the Member's name is placed on the proxy whether manual signature, typewriting, telegraphic transmission, electronic transmission or otherwise) by the Member or the Member's attorney in fact. A proxy may be transmitted by an oral telephonic transmission if it is submitted with information from which it may be determined that the proxy was authorized by the Member or the Member's attorney in fact. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless (I) revoked by the person executing it, before the vote pursuant to that proxy, by a writing delivered to the Company stating that the proxy is revoked, or by a subsequent proxy executed by, or attendance at the meeting and voting in person by, the person executing the proxy; or (ii) written notice of the death or incapacity of the maker of that proxy is received by the Company before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date of the proxy, unless otherwise provided in the proxy. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Corporations Code Sections 705(e) and 705(f).

4.10   Certificate of Membership Interest.

11

A.   Certificate.  A Membership interest may be represented by a certificate of membership.  The exact contents of a certificate of membership may be determined by action of the Manager but shall be issued substantially in conformity with the following requirements.  The certificates of membership shall be respectively numbered serially, as they are issued, shall be impressed with the Company seal or a facsimile thereof, if any, and shall be signed by the Manager or officers of the Company.  Each certificate of membership shall state the name of the Company, the fact that the Company is organized under the laws of the state of California as a limited liability company, the name or the person to whom issued, the date or issue, and the percentage interests represented thereby.   A statement of the designations, preferences, qualifications, limitations, restrictions, and special or relative rights of the Membership Interest, if any, shall be set forth in full or summarized on the face or back of the certificates which the Company shall issue, or in lieu thereof, the certificate may set forth that such a statement or summary will be furnished to any holder of a Membership Interest upon request without charge.  Each certificate of membership shall be otherwise in such form as may be determined by the Manager and shall be issued upon written request of a Member.

B.   Cancellation of Certificate.  All certificates of membership surrendered to the Company for transfer shall be canceled and no new certificates of membership shall be issued in lieu thereof until the former certificates for a like number of Membership Interests shall have been surrendered and canceled, except as herein provided with respect to lost, stolen, or destroyed certificates.

C.   Replacement of Lost, Stolen, or Destroyed Certificate.  Any Member claiming that his or her certificate of membership is lost, stolen, or destroyed may make an affidavit or affirmation of that fact and request a new certificate.  Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Manager, a new certificate may be issued of the same tenor and representing the same Percentage Interest of membership as was represented by the certificate alleged to be lost, stolen, or destroyed.

## ARTICLE V
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1   Management of the Company.

A.   Management by the Manager.  The business, property and affairs of the Company shall be managed by the Manager.  Except as otherwise set forth in the Articles or this Agreement, the Manager shall have full and complete authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

5.2   The Office of Manager.

A.   Number, Term, and Qualifications.  The Company shall initially have one (1) Manager.  The number of Managers of the Company shall be fixed from time to time by the

12

Tellis Dec. Ex. 8, Page 19 of 50

affirmative vote or written consent of a Majority Interest, provided that in no instance shall there be less than one Manager and provided further that if the number of Managers is reduced from more than one to one, the Articles shall be amended to so state, and if the number of Managers is increased to more than one, the Articles shall be amended to delete the statement that the Company has only one Manager.

        B.   <u>Resignation</u>.  The Manager may resign at any time by giving written notice to the Members without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party.  The resignation of the Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.  The resignation of the Manager, who is also a Member, shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

        C.   <u>Removal</u>.  The Manager may be removed at any time, with or without cause, by the affirmative vote of Members holding a Majority Interest at a meeting called expressly for that purpose, or by the written consent of the Members holding a Majority Interest.  The removal shall be without prejudice to the rights of the Manager, who is a Member, as a Member or constitute a withdrawal of a Member.  In addition to the above, the Manager may be removed at any time by written notice from any Member or Members upon the happening of any of the following:

                (i)     The felony conviction of the Manager;

                (ii)    The death or permanent disability or dissolution of the Manager; or

                (iii)   Upon an order or judgment of a court that the Manager has breached it fiduciary obligations to the Members.

        D.   <u>Vacancy</u>.  A vacancy occurring for any reason in the office of Manager may be filled by the affirmative vote or written consent of Members holding a Majority Interest.

**5.3**   <u>Powers of the Manager</u>.

        A.   <u>Powers of the Manager</u> .  Subject to the express limitations set forth elsewhere in this Agreement, the Manager shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, and to make all decision regarding those matters and perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

        B.   <u>Limitations on Power of the Manager</u>.  Notwithstanding any other provisions of this Agreement, the Manager shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of a Majority Interest (or such greater Percentage Interests set forth below) of the Members:

13

(i)     The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a twelve (12) month period, except in the orderly liquidation and winding up of the business of the Company upon its duly authorized dissolution, shall require the affirmative vote or written consent of Members holding a Super Majority;

(ii)    The merger of the Company with another limited liability company or limited partnership shall require the affirmative vote or written consent of Members holding a Super Majority;

(iii)   The merger of the Company with a corporation or a general partnership or other Person shall require the affirmative vote or written consent of all Members;

(iv)    The establishment of different classes of Members shall require the affirmative vote or written consent of a Super Majority of Members holding a Super Majority;

(v)     An alteration of the primary purpose or business of the Company as set forth in Section 2.6 shall require the affirmative vote or written consent of all Members;

(vi)    Any act which would make it impossible to carry on the ordinary business of the Company shall require the affirmative vote or written consent of all Members;

(vii)   The confession of a judgment against the Company;

(viii)  To file a bankruptcy petition on behalf of the Company; and

(ix)    Any other transaction described in this Agreement as requiring the vote, consent, or approval of the Members.

(x)     Binding the Company to any obligation involving consideration with a value in excess of $200,000.00, including without limitation, an agreement to purchase or sell real property, borrow money, lend money or encumber real property.

5.4   **Members Have No Managerial Authority.** The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Act.   Unless expressly and duly authorized in writing to do so by the Manager, no Member shall have any power or authority to

14

07/27/09

**Tellis Dec. Ex. 8, Page 21 of 50**

bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

**5.5** <u>Performance of Duties; Liability of the Manager</u>. The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager. The Manager shall perform his managerial duties in good faith, in a manner they reasonably believe to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. The Manager, so long as he performs the duties of Manager, shall not have any liability by reason of being or having been a Manager of the Company.

In performing his duties, the Manager shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be warranted and provided that the Manager act in good faith and after reasonable inquiry when the need therefor is indicated by the circumstances:

(a)   one or more officers, employees or other agents of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented;

(b)   any attorney, independent accountant, or other person as to matters which the Manager reasonably believes to be within such person's professional or expert competence; or

(c)   a committee upon which the Manager does not serve, duly designated in accordance with a provision of the Articles or this Agreement, as to matters within its designated authority, which committees reasonably believe to merit competence.

**5.6** <u>Devotion of Time</u>. The Manager is not obligated to devote all of his time or business efforts to the affairs of the Company. The Manager shall devote whatever time, effort, and skill as he deems appropriate for the operation of the Company.

**5.7** <u>Competing Activities Right of First Refusal</u>. Except as otherwise set forth in this Agreement, the Manager and the Manager's officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Manager shall not be obligated to prevent any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Manager shall have the right to hold any investment opportunity or prospective economic advantage for its own account or to recommend such opportunity to Persons other than the Company. The Members acknowledge that the Manager

15

**Tellis Dec. Ex. 8, Page 22 of 50**

and the Manager's Affiliates own and/or manage other businesses, including businesses that may compete with the Company and for the Manager's time. The Members hereby waive any and all rights and claims which they may otherwise have against the Manager and his officers, directors, shareholders, partners, members, managers, agents, employees, and Affiliates as a result of any of such activities.

     **5.8**    <u>Transactions between the Company and the Manager</u>.  Notwithstanding that it may constitute a conflict of interest, the Manager may, and may cause the Manager's Affiliates to, engage in any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arm's length, and provided that a Majority Interest of the Members having no interest in such transaction (other than their interests as Members) affirmatively vote or consent in writing to approve the transaction.

     A transaction between the Manager and/or the Manager's Affiliates, on the one hand, and the Company, on the other hand, shall be conclusively determined to constitute a transaction on terms and conditions, on an overall basis, fair and reasonable to the Company and at least is favorable to the Company as those generally available in a similar transaction between parties operating at arm's length if a Majority Interest of the Members having no interest in such transaction (other than their interests as Members) affirmatively vote or consent in writing to approve the transaction.  Notwithstanding the foregoing, the Manager shall not have any obligation in connection with any such transaction between the Company and the Manager or an Affiliate of the Manager, to seek the consent of the Members.

     **5.9**    <u>Payments to the Manager</u>.  Except as specified in this Agreement, neither the Manager nor any Affiliate of the Manager is entitled to remuneration for services rendered or goods provided to the Company. The Manager and the Manager's Affiliates shall receive only the following payments:

     A.    <u>Management Fee</u>. The Company shall not pay the Manager a fee for services in connection with the management of the Company unless unanimously approved by the Members. **[The Company shall pay the Manager a fee for services in connection with the management of the Company.]**

     B.    <u>Reimbursement of The Manager</u>.  The Company shall reimburse the Manager or Affiliates of the Manager for reasonable out-of-pocket expenses incurred on behalf of the Company.

     C.    <u>Expenses</u>. The Company shall reimburse the Manager and the Manager's Affiliates for reasonable out-of-pocket expenses equal to the actual cost of goods and materials used for or by the Company.  Except as otherwise provided herein, the Manager and the

16

Manager's Affiliates shall not be reimbursed by the Company for the following expenses: (1) salaries, compensation or fringe benefits of directors, officers or employees of the Manager or the Manager's Affiliates: (ii) overhead expenses of the Manager or the Manager's Affiliates, including, without limitation, rent and general office expenses; and (iii) the cost of providing any service or goods for which the Manager or the Manager's Affiliates are entitled to compensation under this Agreement.

**5.10** <u>Acts of the Manager as Conclusive Evidence of Authority</u>. Any note, mortgage, license or indebtedness, contract, certificate, statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other person, when signed by the Manager and one other Member, is not invalidated as to the Company by any lack of authority of the Manager and one other Member in the absence of actual knowledge on the part of the other person that the Manager and one other Member had no authority to execute the same.

**5.11** <u>Officers</u> .

A. <u>Appointment of Officers</u>. The Manager may but is not required to appoint an officer or officers at any time. The officers of Company, if deemed necessary by the Manager, may include a chairperson, president, vice president, secretary, and chief financial officer. The officers shall serve at the pleasure of the Manager, subject to all rights, if any, of an officer under any contract of employment. Any individual may hold any number of offices. No officer need be a resident of the State of California or citizen of the United States. If the Manager is not an individual, such Manager's officers may serve as officers of Company if elected by the Members. The officers shall exercise such powers and perform such duties as specified in this Agreement and as shall be determined from time to time by the Manager.

B. <u>Removal, Resignation and Filling of Vacancy of Officers</u>. Subject to the rights, if any, of an officer under a contract of employment, any officer may be removed, either with or without cause, by the Manager at any time.

Any officer may resign at any time by giving written notice to the Manager. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective.

A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Agreement for regular appointment to that office.

C. <u>Salaries of Officers</u>. Officers shall not be paid a salary.

D. <u>Duties and Powers of the Chairperson</u>. The chairperson, if such an officer be appointed, shall, if present, preside at meetings of the Members and the Manager, and exercise and perform such other powers and duties as may be from time to time assigned to him by the Manager or prescribed by this Agreement. If there is no president, the chairperson shall in

17

Tellis Dec. Ex. 8, Page 24 of 50

addition be the chief executive officer of the Company and shall have the powers and duties prescribed in Section 5.11E.

   E. Duties and Powers of the President. Subject to such supervisory powers, if any, as may be given by the Manager to the chairperson, if there be such an officer, the president shall be the chief executive officer of the Company, and shall, subject to the control of the Manager, have general and active management of the business of the Company and shall see that all orders and resolutions of the Members and The Manager are carried into effect. He or she shall have such powers and duties as may be prescribed by the Manager or this Agreement.

   F. Duties and Powers of Vice-President. The vice-president, or if there shall be more than one, the vice-presidents in the order determined by a resolution of the Manager, shall, in the absence or disability of the president, perform the duties and exercise the powers of the president and shall perform such other duties and have such other powers as the Manager by resolution may from time to time prescribe.

   G. Duties and Powers of Secretary. The secretary shall attend all meetings of the Members, and shall record all the proceedings of the meetings in a book to be kept for that purpose, and shall perform like duties for the standing committees when required, the secretary shall give, or cause to be given, notice of all meetings of the Members and shall perform such other duties as may be prescribed by the Manager. The secretary shall have custody of the seal, if any, and the secretary shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature. The Manager may give general authority to any other officer to office the seal of the Company, if any, and to attest the affixing by his or her signature.

   The secretary shall keep, or cause to be kept, at the principal executive office or at the office of the Company's transfer agent or registrar, as determined by resolution of the Manager, a register, or a duplicate register, showing the names of all Members and their addresses, their Percentage Interests, the number and date of certificates issued for the same, and the number and date of cancellation of every certificate surrendered for cancellation. The secretary shall also keep all documents described in Section 9.1 and such other documents as may be required under the Act. The secretary shall perform such other duties and have such other authority as may be prescribed elsewhere in this Agreement or from time to time by the Manager. The secretary shall have the general duties, powers and responsibilities of a secretary of a corporation.

   If the Manager chooses to appoint an assistant secretary or assistant secretaries, the assistant secretaries, in the order of their seniority, in the absence, disability or inability to act of the secretary, shall perform the duties and exercise the powers of the secretary, and shall perform such other duties as the Manager may from time to time prescribe.

   H. Duties and Powers of Chief Financial Officer. The chief financial officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, Membership

18

Tellis Dec. Ex. 8, Page 25 of 50

Interests and Economic Interests. The books of account shall at all reasonable times be open to inspection by the Manager.

The chief financial officer shall have the custody of the funds and securities of the Company, and shall keep full and accurate accounts of receipts and disbursements in looks belonging to the Company, and shall deposit all moneys and other valuable effects in the same and to the credit or the Company in such depositions as may be designated by the Manager.

The chief financial officer shall disburse the funds of the Company as may be ordered by the Manager, taking proper vouchers for such disbursements, and shall render to the president and the Manager, at their regular meetings, or when Members so require, at a meeting of the members an account of all his or her transactions as treasurer and of the financial condition of the Company.

The chief financial officer shall perform such other duties and shall have such other responsibility and authority as may be prescribed elsewhere in this Agreement or from time to time by the Manager.

If the Manager chooses to elect an assistant treasurer or assistant treasurers, the assistant treasurers in the order of their seniority shall, in the absence, disability or inability to act of the chief financial officer, perform the duties and exercise the powers of the chief financial officer, and shall perform such other duties as the Manager shall from time to time prescribe.

      I.    <u>No Signing Authority for Officers</u>. The Officers are not authorized to execute documentation on behalf of the Company solely in their capacities as Officers of the Company.

    **5.12**    <u>Limited Liability</u>. No person who is a Manager or officer or both a Manager and officer of the Company shall be personally liable under any judgment of a court, or in any other manner for any debt obligation, or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise, solely by reason of being a Manager or officer or both a Manager and officer of the Company.

## ARTICLE VI
## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

    **6.1**    <u>Allocations of Net Profits and Net Losses</u> .

    A.    <u>Net Loss</u>. Loss shall be allocated to the Members in proportion to their Percentage interests.

Notwithstanding the previous sentence, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of Company Minimum Gain that would be realized on a foreclosure of the Company's property.

19 .

Collab/Burgyan/Demaratech/Operating Agreement

07/27/09

Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this Section 6.1A). Any loss reallocated under this Section 6.1A shall be taken into account in computing subsequent allocations of income and losses pursuant to this Article VI, so that the net amount of any item so allocated and the income and losses allocated to each Member pursuant to this Article VI, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Article VI if no reallocation of losses had occurred under this Section 6.1A.

B.   Net Profit. Net Profit shall be allocated to the Members in proportion to their Percentage Interests.

**6.2**   Special Allocations.

A.   Minimum Gain Chargeback. Notwithstanding Section 6.1, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2A shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2A. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 6.2 A is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently herewith.

B.   Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain Attributable to a Member Nonrecourse Debt, during any Fiscal Year, each member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2B shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2B. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4). This Section 6.2B is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

C.   Nonrecourse Deductions. Notwithstanding Section 6.1, any nonrecourse deductions (as defined in Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

20

D.    Member Nonrecourse Deductions.    Notwithstanding Section 6.1, those items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Regulations Section 1.704-2(i).

E.    Qualified Income Offset.    Notwithstanding Section 6.1, if a Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible.    Any special allocations of items of income and gain pursuant to this Section 6.2E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 6.2E if such unexpected adjustments, allocations, or distributions had not occurred.

**6.3**    Code Section 704(c) Allocations.    Notwithstanding any other provision in this Article VI, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution.    Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes.    As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

**6.4**    Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest.    If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company of such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his or her respective Membership Interest at the close of such day.

However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, a Membership Interest which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the last day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, of decrease actually occurs (i.e.,

21

Tellis Dec. Ex. 8, Page 28 of 50

sales and dispositions made during the first fifteen (15) days of any month will be deemed to have been made on the 15th day of the month).

Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date such sale or other disposition occurs.

6.5     Distribution of Distributable Cash by the Company.   Subject to applicable law and any limitations contained elsewhere in this Agreement, the Manager shall, not less than quarterly, distribute Distributable Cash to the Members, which distributions shall be in the following order of priority:

(a)     To the extent necessary to pay any unpaid accrued interest and any unpaid principal balance on any loans made to the Company by a Member pursuant to Section 3.5 above, in the order in which such loans were made, the earliest to be satisfied first; and

(b)     To the Members in proportion to their unreturned Capital Contributions until each Member has recovered his or her Capital Contributions; and

(c)     To the Members in proportion to their Percentage Interests.

All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution.  Neither the Company nor the Manager shall incur any liability for making distributions in accordance with this Section 6.5.

6.6     Form of Distribution.   A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money.  No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members.  Except upon dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

6.7     Restriction on Distributions.

A.      No distribution shall be made if, after giving effect to the distribution:

(i)     The Company would not be able to pay its debts to third parties as they become due in the usual course of business.

(ii)    The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

22

Tellis Dec. Ex. 8, Page 29 of 50

B.    The Manager may base a determination that a distribution is not prohibited on any of the following:

(i)    Financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances.

(ii)    A fair valuation.

(iii)    Any other method that is reasonable in the circumstances.

Except as provided in Section 17254(e) of the Corporations Code, the effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within 120 days after the date of authorization, or the date payment is made if it occurs more than 120 days of the date of authorization.

C.    A Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act if it is established that the Member or Manager did not act in compliance with Section 6.7B or Section 10.4. Any Member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so liable and (ii) each Member for the amount the Member received with knowledge of facts indicating that the distribution was made in violation of this Agreement or the Act.

6.8    Return of Distributions.  Except for distributions made in violation of the Act or this Agreement, no Member or Economic Interest Owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company.  The amount of any distribution returned to the Company by a Member or Economic Interest Owner or paid by a Member or Economic Interest Owner for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Economic Interest Owner.

6.9    Obligations of Members to Report Allocations.  The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

## ARTICLE VII
## TRANSFER AND ASSIGNMENT OF INTERESTS

7.1    Transfer and Assignment of Interests.  No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, her or its Membership Interest except with the prior written consent of a Majority Interest, which consent may be given

23

Collab/Burgyan/Demaratech/Operating Agreement

07/27/09

or withheld, conditioned or delayed (as allowed by this Agreement or the Act), as the Members may determine in their sole discretion. Transfers in violation of this Article VII shall only be effective to the extent set forth in Section 7.7. After the consummation of any transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

     7.2    Further Restrictions on Transfer of Interests. In addition to other restrictions found in this Agreement, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, her or its Membership Interest: (i) without compliance with Section 12.10, and (ii) if the Membership Interest to be transferred, assigned, sold or exchanged, when added to the total of all other Membership Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would cause the termination of the Company under the Code, as determined by the Manager.

     7.3    Substitution of Members. A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 7.1 and 7.2 relating to consent of Members, securities and tax requirements hereof are met, (ii) such Person executes an instrument satisfactory to the Manager accepting and adopting the terms and provisions of this Agreement, and (iii) such person pays any reasonable expenses in connection with his or her admission as a new Member. The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

     7.4    Permitted Transfers. The Membership Interest of any Member may be transferred subject to compliance with Section 7.2, and without the prior written consent of a Majority Interest as required by Section 7.1, upon consent of the Manager, which shall not be unreasonably withheld, by the Member to an inter vivos trust of which the Member is a Trust or to an entity in which the Member holds at least a majority of the stock or partnership or membership interests and also exercises day to day and ultimate control.

     7.5    Effective Date of Permitted Transfers. Any permitted transfer of all or any portion of a Membership Interest shall be effective as of the date provided in Section 6.3 following the date upon which the requirements of Sections 7.1, 7.2 and 7.3 have been met. The Manager shall provide the Members with written notice of such transfer as promptly as possible after the requirements of Sections 7.1, 7.2 and 7.3 have been met. Any transferee of a Membership Interest shall take subject to the restrictions on transfer imposed by this Agreement.

     7.6    Rights of Legal Representatives. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member hereunder the Articles or this Agreement to give an assignee the right to become a Member. If a Member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by his or her legal representative or successor.

Collab/Burgyan/Demaratech/Operating Agreement

07/27/09

Tellis Dec. Ex. 8, Page 31 of 50

**7.7**   <u>No Effect to Transfers in Violation of Agreement</u>.   Upon any transfer of a Membership Interest in violation of this Article VII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member.   Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled.   Notwithstanding the immediately preceding sentences, if, in the determination of the Manager, a transfer in violation of this Article VII would cause the termination of the Company under the Code, in the sole discretion of the Manager, the transfer shall be null and void and the purported transferee shall not become either a Member or an Economic Interest Owner.

Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of $100, all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest.   Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.

Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article VII is not unreasonable under the circumstances existing as of the date hereof.

**7.8**   <u>Right of First Refusal</u>.   Each time a Member proposes to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest (or as required by operation of law or other involuntary transfer to do so) other than pursuant to Section 7.4, such Member shall first offer such Membership Interest to the Company and the non-transferring Members in accordance with the following provisions:

A.   Such Member shall deliver a written notice to the Company and the other Members stating (i) such Member's bona fide intention to transfer such Membership Interest, (ii) the name and address of the proposed transferee (iii) the Membership Interest to be transferred, and (iv) the purchase price and other economic terms on which the Member proposes to transfer such Membership Interest.

B.   Within thirty (30) days after receipt of the notice described in Section 7.8A, each non-transferring Member shall notify the Manager in writing of his or her desire to purchase a portion of the Membership Interest being so transferred.   The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest which may be so transferred.   Each

25

Tellis Dec. Ex. 8, Page 32 of 50

Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all of the Members electing to so purchase the Membership Interest being transferred. In the event any Member elects to purchase none or less than all of his or her pro rata share of such Membership Interest, then the other Members can elect to purchase more than their pro rata share. If such Members fail to purchase the entire Membership Interest being transferred, the Company may purchase any remaining share of such Membership Interest.

        C.     Within ninety (90) days after receipt of the notice described in Section 7.8A the Company and the Members electing to purchase such Membership Interest shall have the first right to purchase or obtain such Membership Interest upon the price and terms of payment designated in such notice.  If such notice provides for the payment of non-cash consideration, the Company and such purchasing Members each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Manager.

        D.     If the Company or the other Members elect not to purchase or obtain all of the Membership Interest designated in such notice, then the transferring Member may transfer the Membership Interest described in the notice to the proposed transferee, providing such transfer (i) is completed within thirty (30) days after the expiration of the Company's and the other Members' right to purchase such Membership Interest, (ii) is made on terms no less favorable to the transferring Member than as designated in the notice, and (iii) the requirements of Sections 7.1, 7.2 and 7.3 relating to the consent of Members holding a Majority in Interest, securities and tax requirements hereof are met.  If such Membership interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent transfer of such Membership Interest.

## ARTICLE VIII
## CONSEQUENCES OF DEATH, DISSOLUTION, RETIREMENT OR BANKRUPTCY OF MEMBER

    **8.1**    Dissolution Event. Upon the occurrence of a Dissolution Event, the Company shall dissolve unless the remaining Members ("Remaining Members") holding all of the remaining Membership Interests consent within ninety (90) days of the Dissolution Event to the continuation of the business of the Company.  If the Remaining Members consent to the continuation of the business or the Company, the Company and/or the Remaining Members shall purchase, and the Member whose actions or conduct resulted in the Dissolution Event ("Former Member") or such Former Member's legal representative shall sell, the Former Member Membership Interest ("Former Member's Interest") as provided in this Article VIII to avoid dissolution of the Company.

    **8.2**    Withdrawal.  Notwithstanding Section 8.1, only upon the withdrawal by a Member in accordance with Section 4.4 will such Member be treated as a Former Member, and will the Company and/or the Remaining Members be obligated to purchase, and will the Former Member be obligated to sell, the Former Member's Interest as provided in this Article VIII.

**8.3** <u>Purchase Price</u>.  The purchase price for the Former Member's Interest shall be the Capital Account balance of the Former Member as adjusted pursuant to Section 3.3; provided, however, that if the Former Member, such Former Member's legal representative or the Company, deems the Capital Account balance to vary from the fair market value of the Former Member's Interest by more than ten percent (10%), such party shall be entitled to require an appraisal by providing notice of the request for appraisal within thirty(30) days after the determination of the Remaining Members to continue the business of the Company.  In such event, the value of the Former Member's Interest shall be determined by three (3) independent appraisers, one selected by the Former Member or such Former Member's legal representative, one selected by the Company, and one selected by the two appraisers so named.  The fair market value of the Former Member's Interest shall be the average of the two appraisals closest in amount to each other.  In the event the fair market value is determined to vary from the Capital Account balance by less than ten percent (10%), the party requesting such appraisal shall pay all expense of all the appraisals incurred by the party offering to enter into the transaction at the Capital Account valuation.  In all other events, the party requesting the appraisal shall pay one-half of such expense and the other party shall pay one-half of such expense.  Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

**8.4** <u>Notice of Intent to Purchase</u>.  Within thirty (30) days after the Manager has notified the Remaining Members as to the purchase price of the Former Member's Interest determined in accordance with Section 8.3, each Remaining Member shall notify the Manager in writing of his or her desire to purchase a portion of the Former Member's Interest.  The failure or any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest.  Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Member's Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests or all or the Remaining Members electing to purchase the Former Member's Interest.

**8.5** <u>Election to Purchase Less Than All of the Former Member's Interest</u>.  If any Remaining Member elects to purchase none or less than all of his or her pro rata share of the Former Member's Interest, then the Remaining Members can elect to purchase more than their pro rata share.  If the Remaining Members fail to purchase the entire interest of the Former Member, the Company shall purchase any remaining share of the Former Member's Interest.

**8.6** <u>Payment of Purchase Price</u>.  The purchase price shall be paid by the Company or the Remaining Members, as the case may be, by either of the following methods, each of which may be selected separately by the Company or the Remaining Members:

A.     The Company or the Remaining Members shall at the closing pay in cash the total purchase price for the Former Member's Interest: or

27

Collab/Burgyan/Demaratech/Operating Agreement

07/27/09

B.     The Company or the Remaining Members shall pay at the closing one tenth (1/10th) of the purchase price in which case the balance of the purchase price shall then be paid in four equal annual principal installments, plus accrued interest, and be payable each year on the anniversary date of the closing.  The unpaid principal balance shall accrue interest at the current applicable federal rate as provided in the Code for the month in which the initial payment is made, but the Company and the Remaining Members shall have the right to prepay in full or in part at any time without penalty.  The obligation to pay the balance due shall be evidenced by a promissory note, and if purchased by a Remaining Member, secured by a pledge of the Membership interest being purchased.

**8.7**     Closing of Purchase of Former Member's Interest.  The closing for the sale of a Former Member's Interest pursuant to this Article VIII shall be held at 10:00 a.m. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day.  At the closing, the Former Member or such Former Member's legal representative shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest.  The Former Member or such Former Member's legal representative, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

**8.8**     Purchase Terms Varied by Agreement.  Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

## ARTICLE IX
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

**9.1**     Books and Records.  The books and records of the Company shall be kept, and the financial position and the results or its operations recorded, in accordance with the accounting methods followed for federal income tax purposes.  The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business.  The Company shall maintain at its principal office in California all of the following:

A.     A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner;

B.     A current list of the full name and business or residence address of each Manager;

28

Tellis Dec. Ex. 8, Page 35 of 50

C.     A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

D.     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

E.     A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

F.     Copies of the financial statements of the Company, if any, for the six most recent Fiscal Years; and

G.     The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years.

**9.2**     Delivery to Members and Inspection .

A.     Upon the request of any Member or Economic Interest Owner for purposes reasonably related to the interest of that Person as a Member or Economic Interest Owner, the Manager shall promptly deliver to the requesting Member or Economic Interest Owner, at the expense of the Company, a copy of the information required to be maintained by Sections 9.1 A, B and D, and a copy of this Agreement.

B.     Each Member, Manager and Economic Interest Owner has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Manager or Economic Interest Owner, to:

(i)     inspect and copy during normal business hours any of the Company records described in Sections 9.1A through G; and

(ii)     obtain from the Manager, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year.

C.     Members representing at least five percent (5%) of the Percentage Interests, or three or more Members, make a written request to the Manager for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current Fiscal Year ended more than 30 days prior to the date of the request, and a balance sheet of the Company as of the end of that period. Such statement shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the statement was prepared without audit from the books and records of the Company. If so requested, the statement shall be delivered or mailed to the Members within 30 days thereafter.

29

Tellis Dec. Ex. 8, Page 36 of 50

D.      Any request, inspection or copying by a Member or Economic Interest Owner under this Section 9.2 may be made by that Person or that Person's agent or attorney.

E.      The Manager shall promptly furnish to a Member a copy of any amendment to the Articles or this Agreement executed by the Manager pursuant to a power of attorney from the Member.

**9.3     Annual Statements.**

A.      The Manager shall cause an annual report to be sent to each of the Members not later than 120 days after the close of the Fiscal Year.  The report shall contain a balance sheet as of the end of the Fiscal Year and an income statement and statement of changes in financial position for the Fiscal Year.  Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the financial statements were prepared without audit from the books and records of the Company.

B.      The Manager shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' and Economic Interest Owners' federal and state income tax returns.  The Manager shall send or cause to be sent to each Member or Economic Interest Owner within 90 days after the end of each taxable year such information as is necessary to complete federal and state income tax or information returns, and, if the Company has 35 or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for that year.

C.      The   Manager shall cause to be filed biennially with the California Secretary of State the statement of information required under California Corporations Code §17060.

**9.4     Financial and Other Information.**  The Manager shall provide such financial and other information relating to the Company or any other Person in which the Company owns, directly or indirectly, an equity interest, as a Member may reasonably request. The Manager shall distribute to the Members, promptly after the preparation or receipt thereof by the Manager, any financial or other information relating to any person in which the Company owns, directly or indirectly, an equity interest, including any filings by such Person under the Securities Exchange Act of 1934, as amended, that is received by the Company with respect to any equity interest of the Company in such Person.

**9.5     Filings.**  The Manager, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities.  The Manager, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Manager required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or

30

refuses to do so, the Manager or any of the Members may prepare, execute and file that document with the California Secretary of State.

     **9.6**    <u>Bank Accounts</u>.  The Manager shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

     **9.7**    <u>Accounting, Decisions and Reliance on Others</u>.  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager.  The Manager may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

     **9.8**    <u>Tax Matters for the Company Handled by the Manager and Tax Matters Partner</u>.  The Manager shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members.  The Tax Matters Partner as defined in Code Section 6231 shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith.  The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the Company.  If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Manager, as the case may be, Members holding a Majority Interest may designate another to be Tax Matters Partner.

**ARTICLE X**
**DISSOLUTION AND WINDING UP**

     **10.1**    <u>Dissolution</u>.  The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

         A.    Upon the happening of any event of dissolution specified in the Articles;

         B.    Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;

         C.    Upon the vote of Members holding a Super Majority or of non-defaulting Members holding a Majority of the Percentage Interests held by all non-defaulting Members pursuant to Section 3.5C;

         D.    The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 8.1 to continue the business of the Company within ninety (90) days after the occurrence of such event or the failure of the Company or the Remaining Members to purchase the Former Member's Interest as provided in Section 8.2; or

         E.    The sale of all or substantially all of the assets of Company.

31

**Tellis Dec. Ex. 8, Page 38 of 50**

**10.2**   Certificate of Dissolution. As soon as possible following the occurrence of any of the events specified in Section 10.1, the Manager who has not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act.

**10.3**   Winding Up. Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Manager who have not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 10.5. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Manager or Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

**10.4**   Distributions in Kind. Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value, such Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by the Manager or by the Members or if any Member objects by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Manager or liquidating trustee and approved by the Members.

**10.5**   Order of Payment of Liabilities Upon Dissolution.

A.   After determining that all known debts and liabilities of the Company in the process of winding-up, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs. Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

B.   The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, has been adequately provided for if the payment has been provided for by either of the following means:

32

Tellis Dec. Ex. 8, Page 39 of 50

      (i)     Payment thereof has been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members or The Manager to be adequate at the time of any distribution of the assets pursuant to this Section.

      (ii)    The amount of the debt or liability has been deposited as provided in Section 2008 of the Corporations Code.

This Section 10.5B shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

**10.6**   <u>Compliance with Regulations</u>. All payments to the Members upon the winding and dissolution of Company shall be strictly in accordance with the positive capital account balance limitation and other requirements of Regulations Section 1.704-1(b)(2)(ii)(d).

**10.7**   <u>Limitations on Payments Made in Dissolution</u>. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Manager or any other Member except as provided in Article XI.

**10.8**   <u>Certificate of Cancellation</u>. The Manager or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

**10.9**   <u>No Action for Dissolution</u>. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1. This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Manager have failed to liquidate the Company as required by this Article X, each Member hereby waives and renounces his or her right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 10.9 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

33

## ARTICLE XI
## INDEMNIFICATION AND INSURANCE

**11.1**   Indemnification of Agents.  The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he or she is or was serving at the request of the Company as the Manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Manager shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Manager deem appropriate in their business judgment.

**11.2**   Insurance .  The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 11.1 or under applicable law.

## ARTICLE XII
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Manager, the other Members, and the Company as follows:

**12.1**   Preexisting Relationship or Experience.  He or she has a preexisting personal or business relationship with the Company or one or more of its officers, the Manager or control persons or (ii) by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he or she is capable of evaluating the risks and merits of an investment in the Membership Interest and of protecting his or her own interests in connection with this investment.

**12.2**   No Advertising.  He or she has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

**12.3**   Investment Intent.  He or she is acquiring the Membership Interest for investment purposes for his or her own account only and not with a view to or for sale in connection with

34

Tellis Dec. Ex. 8, Page 41 of 50

any distribution of all or any part of the Membership Interest. No other person shall have any direct or indirect beneficial interest in or right to the Membership Interest.

     12.4   Purpose of Entity. If the Member is a corporation, partnership, limited liability company, trust, or other entity, it was not organized for the specific purpose of acquiring the Membership Interest.

     12.5   Residency. Each is a resident of, or is duly qualified to business in, the State of California.

     12.6   Economic Risk. He or she is financially able to bear the economic risk of an investment in the Membership Interest including the total loss thereof.

     12.7   No Registration of Membership Interest. He or she acknowledges that the Membership Interest has not been registered under the Securities Act of 1933, as amended (the "Securities Act" or qualified under the California Corporate Securities Act of 1968, as amended, or any other applicable blue sky laws in reliance, in part, on his or her representations, warranties, and agreements herein.

     12.8   Membership Interest in Restricted Security. He or she understands that the Membership Interest is a "restricted security" under the Securities Act in that the Membership Interest will be acquired from the Company in a transaction not involving a public offering, and that the Membership Interest may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Membership Interest must be held indefinitely. In this connection, he or she understands the resale limitations imposed by the Securities Act and is familiar with SEC Rule 144, as presently in effect, and the conditions which must be met in order for that Rule to be available for resale of "restricted securities," including the requirement that the securities must be held for at least two years after purchase thereof from the Company prior to resale (three years in the absence of publicly available information about the Company) and the condition that there be available to the public current information about the Company under certain circumstances. He or she understands that the Company has not made such information available to the public and has no present plans to do so.

     12.9   No Obligation to Register. He or she represents, warrants, and agrees that the Company and the Manager is under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist him or her in complying with any exemption from registration and qualification.

     12.10   No Disposition in Violation of Law. Without limiting the representations set forth above, and without limiting Article VII of this Agreement, he or she will not make any disposition of all or any part of the Membership Interest which will result in the violation by him or her or by the Company of the Securities Act, the California Corporate Securities Law of 1968, or any other applicable securities laws. Without limiting the foregoing, he or she agrees not to make any disposition of all or any part of the Membership Interest unless and until:

35

Tellis Dec. Ex. 8, Page 42 of 50

A.     There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement and any applicable requirements of state securities laws; or

B.     (i)     He or she has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably requested by the Manager, he or she has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

C.     In the case of any disposition of all or any part of the Membership Interest pursuant to SEC Rule 144, in addition to the matters set forth in Section 12.1 1B, he or she shall promptly forward to the Company a copy of any Form 144 filed with the SEC with respect to such disposition and a letter from the executing broker satisfactory to the Company evidencing compliance with SEC Rule 144. If SEC Rule 144 is amended or if the SEC's interpretations thereof in effect at the time of any such disposition have changed from its present interpretations thereof, he or she shall provide the Company with such additional documents as the Manager may reasonably require.

**12.11** Legends.  He or she understands that the certificates (if any) evidencing the Membership Interest may bear one or all of the following legends:

A.     "THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH HEREIN."

B.     Any legend required by applicable state securities laws.

**12.12** Investment Risk.  He or she acknowledges that the Membership Interest is a speculative investment which involves a substantial degree of risk of loss by him or her of his or her entire investment in the Company, that he or she understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history.

**12.13** Investment Experience.  He or she is an experienced investor in unregistered and restricted securities of limited liability companies or limited partnerships.

36

**12.14**  Restrictions on Transferability.  He or she acknowledges that there are substantial restrictions on the transferability of the Membership Interest pursuant to this Agreement, that there is no public market for the Membership Interest and none is expected to develop, and that, accordingly, it may not be possible for him or her to liquidate his or her investment in the Company.

**12.15**  Information Reviewed.  He or she has received and reviewed all information he or she considers necessary or appropriate for deciding whether to purchase the Membership Interest.  He or she has had an opportunity to ask questions and receive answers from the Company and its officers,  the Manager and employees regarding the terms and conditions of purchase of the Membership Interest and regarding the business, financial affairs, and other assets of the Company and has further had the opportunity to obtain all information (to the extent the Company possesses or can acquire such information without unreasonable effort or expense which he or she deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to him or her.

**12.16**  No Representations By Company.   Neither the Manager, nor any agent or employee of the Company or of the Manager, nor any other Person has at any time expressly or implicitly represented, guaranteed, or warranted to him or her that he or she may freely transfer the Membership Interest, that a percentage of profit and/or amount or type of consideration will be realized as a result of an investment in the Membership Interest, that past performance or experience on the part of the Manager or the Manager's Affiliates or any other person in any way indicates the predictable results of the ownership of the Membership Interest or of the overall Company business, that any cash distributions from Company operations or otherwise will be made to the Members by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Company.

**12.17**  Consultation with Attorney.  He or she has been advised to consult with his or her own attorney regarding all legal matters concerning an investment in the Company and the tax consequences of participating in the Company, and has done so, to the extent he or she considers necessary.

**12.18**  Tax Consequences.  He or she acknowledges that the tax consequences to his or her of investing in the Company will depend on his or her particular circumstances, and neither the Company, the Manager, the Members, nor the partners, shareholders, members, managers, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to him or her of an investment in the Company. He or she will look solely to, and rely upon, his or her own advisers with respect to the tax consequences of this investment.

**12.19**  No Assurance of Tax Benefits.  He or she acknowledges that there can be no assurance that the Code or the Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the Members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service.

**12.20**  Indemnity.  He or she shall indemnify and hold harmless the Company, the Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him or her including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the Company, the Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, attorneys, accountants, agents, registered representatives, and control persons of any such Person (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by such Person in connection with such action, suit, proceeding, or the like.

## ARTICLE XIII
## MISCELLANEOUS

**13.1**  Complete Agreement.  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members and The Manager with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and The Manager or any of them.  No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or The Manager or have any force or effect whatsoever.  To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

**13.2**  Binding Effect.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

**13.3**  Parties in Interest.  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and The Manager and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**13.4**  Pronouns: Statutory References.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require.  Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

38

Collah/Burgyan/Demaratcoh/Operating Agreement

07/27/09

**13.5**  Headings.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

**13.6**  Interpretation.  In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his or her counsel.

**13.7**  References to this Agreement.  Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

**13.8**  Exhibits.  All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

**13.9**  Severability.  If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

**13.10**  Additional Documents and Acts.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

**13.11**  Notices.  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member or Manager at the address specified in Exhibit A hereto.  Any party may, at any time by giving five (5) days' prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

**13.12**  Amendments.  All amendments to this Agreement will be in writing and signed by all of the Members.

**13.13**  Reliance on Authority of Person Signing Agreement.  If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

**13.14**  No Interest in Company Property; Waiver of Action for Partition.  No Member or Economic Interest Owner has any interest in specific property of the Company.  Without limiting

39

Tellis Dec. Ex. 8, Page 46 of 50

the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

**13.15**   Multiple Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**13.16**   Attorney Fees.   In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

**13.17**   Time is of the Essence.   All dates and times in this Agreement are of the essence.

**13.18**   Remedies Cumulative.   The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

**13.21**   Legal Representation.   The parties hereto understand that this Agreement has been prepared by the attorney for one of the Members, Madison Commercial Real Estate, Inc. Each other party hereto has been given the opportunity to seek independent legal representation.

**13.22**   Special Power of Attorney.

    A.   Attorney in Fact.   Each Member grants the Manager a special power of attorney irrevocably making, constituting, and appointing the Manager as the Member's attorney in fact, with all power and authority to act in the Member's name and on the Member's behalf to execute, acknowledge and deliver and swear to in the execution, acknowledgment, delivery and filing of the following documents:

    (i)      Promissory notes to be delivered pursuant to Section 3.5;

    (ii)     Security agreements to be delivered pursuant to Section 3.5;

    (iii)    UCC-1 financing statements to be delivered pursuant to Section 3.5 and all amendments thereto;

    (iv)    Assignments of certificates of membership interest or other documents of transfer to be delivered pursuant to Section 3.5 or in connection with the purchase of a Membership Interest pursuant to Section 3.5, Section 7.7 or Article VIII;

    (v)     Any other instrument or document that may be reasonably required by the Manager in connection with any of the foregoing or to

40

**Tellis Dec. Ex. 8, Page 47 of 50**

7. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED

DATE 3/17/09

SIGNATURE OF ORGANIZER

Daniel E. Olivier
TYPE OR PRINT NAME OF ORGANIZER

LLC-1 (REV 04/2007)                                                      APPROVED BY SECRETARY OF STATE

reflect any reduction in the Member's Capital Account or Percentage Interest pursuant to Section 3.5; and

(vi)   Any consent to the representation of the Company by counsel selected by the Manager as described in Section 13.2.

B.   Irrevocable Power. The special power granted in Section 13.22A: (I) is irrevocable, (ii) is coupled with an interest and (iii) shall survive a Member's death, incapacity or dissolution.

C.   Signatures. The Manager may exercise the special power of attorney granted in Section 13.22A by a facsimile signature of the Manager or one of the Manager's officers or by signature of the Manager or one of the Manager's officers.

IN WITNESS WHEREOF, all of the Members of DEMARATECH, LLC, a California Limited Liability Company, have executed this Agreement, effective as of the date written above.

Member:

Istvan A. Burgyan

**EXHIBIT A**

**PERCENTAGE INTEREST AND
ADDRESSES OF MEMBERS
AS OF
April 17, 2009**

| Member's Name | Member's Address | Member Percentage Interest |
|---|---|---|
| Istvan A. Burgyan | 80-213 Golden Gate Drive Indio, CA 92201 | 100% |

41

Colleb/Burgyan/Demaratech/Operating Agreement

07/27/09

LLC-1   File #_____

**2 0 0 9 0 7 8 1 0 2 7 7**



# State of California
# Secretary of State

## LIMITED LIABILITY COMPANY
## ARTICLES OF ORGANIZATION

A $70.00 filing fee must accompany this form.

**IMPORTANT -- Read instructions before completing this form.**

**ENDORSED - FILED**
In the office of the Secretary of State
of the State of California

**MAR 17 2009**

This Space For Filing Use Only

ENTITY NAME (End the name with the words "Limited Liability Company." or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

1. NAME OF LIMITED LIABILITY COMPANY

**Demaratech, LLC**

PURPOSE (The following statement is required by statute and should not be altered.)

2. THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT

INITIAL AGENT FOR SERVICE OF PROCESS (If the agent is an individual, the agent must reside in California and both items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 3 must be completed (leave Item 4 blank).

3. NAME OF INITIAL AGENT FOR SERVICE OF PROCESS

**Istvan A. Burgyan**

| 4 IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 82-213 Golden Gate Drive | Indio | CA | 92201 |

MANAGEMENT (Check only one)

5. THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY

[✓] ONE MANAGER

[ ] MORE THAN ONE MANAGER

[ ] ALL LIMITED LIABILITY COMPANY MEMBER(S)

ADDITIONAL INFORMATION

6. ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE

EXECUTION

7. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED

**3/17/09**
DATE

_____
SIGNATURE OF ORGANIZER

Daniel E. Olivier
TYPE OR PRINT NAME OF ORGANIZER

LLC-1 (REV 04/2007)

APPROVED BY SECRETARY OF STATE



ATTACHMENT

FOR

DEMARATECH, LLC

The organizer named is not, and will not be, a member or manager of the limited liability company and will have no responsibility for any business or other activity of the limited liability company.

